IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ROBERT C. LITTLE et al.,
    *Plaintiff*,

v.

MAYOR AND CITY COUNCIL OF
OCEAN CITY, *et al.*,
    *Defendants*.

Civil Action No. ELH-18-360

**MEMORANDUM OPINION**

In this land use case, plaintiffs Robert and Pamela Little (together, the "Littles") filed a First Amended Complaint against a host of defendants: the Mayor and City Council for the Town of Ocean City, Maryland (the "City" or "Ocean City"); Blaine Smith, the City's former Assistant Director of Planning and Zoning; City engineer Terrance McGean (collectively, the "City Defendants"); Mark Belton, the former Secretary of the Maryland Department of Natural Resources ("DNR")[1]; Jordan R. Loran, DNR Director of Engineering and Construction; and Emily Wilson, former DNR Director of Land Acquisition and Planning (collectively, the "DNR Defendants"). ECF 37. The City Defendants and the DNR Defendants were sued in their individual and official capacities. In sum, the Littles contend that the defendants have violated their rights to substantive and procedural due process, and have effected an unconstitutional taking of their property, under both federal and Maryland law, by thwarting their efforts to expand their oceanfront townhouse in Ocean City.

---

[1] Mark Belton stepped down as the Secretary of DNR on February 1, 2019. *See Former Secretaries: Mark J. Belton*, Md. Dep't of Nat. Res., https://msa.maryland.gov/msa/mdmanual/ 21dnr/former/html/msa17105.html (last viewed Sept. 13, 2019). Accordingly, Belton is no longer a proper defendant to the extent that plaintiffs sue the Secretary of DNR in his official capacity. No request was made by either side for a substitution of party.

The First Amended Complaint, which is supported by two exhibits (ECF 37-1; ECF 37-2), contains eight counts.  Plaintiffs seek declaratory relief, compensatory and punitive damages, as well as equitable remedies.  ECF 37 at 33-37.

The suit is not a model of clarity.  Count One appears to be lodged only against the City, based on the title, although the text makes reference to the individual City Defendants.  The count asserts violations of substantive and procedural due process and the Takings Clause under the Fifth and Fourteenth Amendments to the Constitution, pursuant to 42 U.S.C. § 1983; Article 24 of the Maryland Declaration of Rights; and Article III, § 40 of the Maryland Constitution.  ECF 37, ¶¶ 103-07.  Because these claims are framed under *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978), I conclude that Count One is lodged only against the City.  ECF 37, ¶ 105.

Count Two is brought against the DNR Defendants in their individual and official capacities under the Fifth and Fourteenth Amendments to the Constitution, pursuant to § 1983, and Article 24 of the Maryland Declaration of Rights.  *Id.* ¶¶ 108-12.[2]  Counts Three and Four lodge "Inverse Condemnation" claims against Ocean City under Maryland law.  *Id.* ¶¶ 113-22.  Count Five, lodged against Ocean City and Smith, asserts a claim of negligence under Maryland's Local Government Tort Claims Act ("LGTCA"), Md. Code (2013 Repl. Vol., 2018 Supp.), §§ 5-301 *et seq.* of the Courts and Judicial Proceedings Article ("C.J.").  *Id.* ¶¶ 123-27.  In Count Six, plaintiffs present a claim of negligence against the City and McGean under the LGTCA.  *Id.* ¶¶ 128-33.  Count Seven, styled as a claim against Belton for "Specific Performance," seeks

---

[2] Count Two includes DNR as a defendant.  ECF 37 at 27.  However, plaintiffs did not name DNR as a defendant in either their original or amended complaint.  *See* ECF 1, ¶¶ 5-12; ECF 37, ¶¶ 9-16.  Nor have plaintiffs served DNR.  *See Docket.*  Accordingly, I shall disregard the inclusion of DNR as a defendant in Count Two.

injective relief. *Id.* ¶¶ 134-36. Finally, Count Eight contains an inverse condemnation claim against Ocean City, under both federal and State law. *Id.* ¶¶ 137-41.

Three motions are now pending. The City Defendants have moved to dismiss Counts One, Three, Four, Five, Six, and Eight, for lack of subject matter jurisdiction and for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6). ECF 38. The motion is supported by a memorandum of law. ECF 38-1 (collectively, "City Motion"). The City Defendants assert, *inter alia*, that plaintiffs' takings claims fail because plaintiffs lack a constitutionally protected property interest; the LGTCA claims are time-barred; and the individual defendants are entitled to qualified immunity. *See* ECF 38-1.

The DNR Defendants have moved to dismiss Counts Two and Seven (ECF 40), under Rules 12(b)(1) and 12(b)(6), supported by a memorandum of law (ECF 40-1) (collectively, "DNR Motion"), and an exhibit. ECF 40-2. The DNR Defendants invoke the *Pullman* and *Burford* abstention doctrines. They also contend that plaintiffs' claims are barred by the Eleventh Amendment; the individual defendants are immune from suit; and plaintiffs have not identified a cognizable property interest. *See* ECF 40-1. Further, pursuant to Fed. R. Civ. P. 12(f), the DNR Defendants have moved to strike portions of plaintiffs' First Amended Complaint as well as plaintiffs' Exhibit A (ECF 37-1). ECF 39. The motion is supported by a memorandum of law. ECF 39-1 (collectively, "Motion to Strike").

The Littles oppose each motion. ECF 44; ECF 45; ECF 46. The DNR Defendants replied to plaintiffs' opposition to their Motion to Strike (ECF 49), and to plaintiffs' opposition to their motion to dismiss. ECF50. The City Defendants have also filed a reply. ECF 52.

No hearing is necessary to resolve these motions.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion to Strike (ECF 39), and I shall grant in part and deny in part the City Motion (ECF 38) and the DNR Motion (ECF 40).

## I.    Factual Background[3]

The Littles own a beachfront townhouse in Ocean City, Maryland.  ECF 37, ¶ 9.  The property, located on Atlantic Avenue, is part of the Surf Village residential development complex.  *Id.*  Plaintiffs' unit lies at the end of a row of condominiums, with one side abutting 32nd Street.  *Id.* ¶¶ 31-32; *see* ECF 37-2.  A side lot, roughly ten feet wide, referred to by the parties as "Parcel A," separates plaintiffs' property from the 32nd Street sidewalk.  ECF 37, ¶ 21; ECF 37-2.

Surf Village was built in or about 1966.  ECF 37, ¶ 20.  Upon completion, the developer, Charles Lynch, retained ownership over small, unbuildable plots of land scattered throughout Surf Village, including Parcel A.  *Id.*  On September 15, 1975, Lynch gifted Parcel A to the City.  *Id.* ¶ 24.  Plaintiffs aver that Lynch transferred Parcel A "without giving proper notice of the conveyance to the adjacent property owner . . . ."  *Id.*

In 1985, a fire totally destroyed Surf Village.  *Id.* ¶ 28.  Although the condominiums were originally three stories, they were rebuilt as four-floor units.  *Id.*  According to plaintiffs, this violated the City's Comprehensive Zoning Ordinance ("Ordinance"), which mandates that four-story buildings must be set back at least ten feet from City property.  *Id.* ¶¶ 22, 29-30.  Despite the violation, the City did not block the construction of new units.  *Id.* ¶ 29.

The Littles purchased their townhouse on May 18, 1994.  *Id.* ¶ 18.  In May 2005, the City extended 32nd Street towards the ocean.  *Id.* ¶ 31.  Soon thereafter, plaintiffs contacted McGean to request that the City slope the portion of the sidewalk near their house to make it level with 32nd

---

[3] As discussed, *infra*, at this juncture I shall assume the truth of the facts alleged in the suit.

Street.  *Id.* ¶32.  Plaintiffs hoped to then build a "short driveway" over Parcel A to connect their property to the road.  *Id.*  ¶ 33.  They sought to install a "concrete pad" at the end of the driveway to function as a parking space and patio.  *Id.*

On April 26, 2005, the Littles filed a building permit application for the driveway and parking pad.  *Id.* ¶ 34.  The City granted their application on May 3, 2005, and they began construction shortly thereafter.  *Id.* ¶ 35.

The City conveyed its fee simple interest in Parcel A to DNR on June 1, 2005.  *Id.* ¶ 37.  DNR acquired Parcel A in furtherance of the Replenishment and Hurricane Protection Project, a joint initiative between DNR and the Army Corp of Engineers.  *Id.*  DNR recorded a deed to Parcel A on July 13, 2005.  *Id.*  The deed makes no mention of plaintiffs or any easements burdening the land. *See id.*

In the spring of 2014, plaintiffs decided to build a 1,700 square-foot, four-story addition to their home, and hired an architect to draw up plans.  *Id.* ¶ 40.  The architect reviewed the designs with Smith, who, plaintiffs allege, "represented that he saw no impediments to building the addition."  *Id.* ¶¶ 42-43.  In light of the meeting, the Littles hired a construction company.  *Id.* ¶¶ 44, 46.

On January 2, 2015, plaintiffs applied for a building permit for the expansion.  *Id.* ¶ 46.  The City granted the permit on January 29, 2015.  *Id.* ¶ 47.

According to plaintiffs, several of their neighbors contacted DNR in February 2015, with the goal of blocking the renovation.  They assert that the President of the Surf Village Homeowners Association sent a letter to Loran, informing him that plaintiffs were using Parcel A as a driveway.  *Id.* ¶ 48.  Plaintiffs contend that another resident relayed the same information to Loran.  *Id.* ¶49.

These complaints led Loran to ask McGean for information about plaintiffs' use of Parcel A. *Id.* ¶ 50.

On February 11, 2015, Loran told McGean and Smith that DNR did not approve of plaintiffs' use of Parcel A. *Id.* ¶ 51. The next day, McGean informed plaintiffs that their renovation did not comply with the City's Ordinance because they lacked the requisite number of parking spaces for their expansion. *Id.* ¶¶ 51, 54.

Undeterred, the Littles submitted a new permit application to the City, reducing the number of bedrooms in the proposed renovation to comply with the parking-space zoning requirement. *Id.* ¶ 56. The City reissued the building permit on February 24, 2015. *Id.* ¶ 57.

Plaintiffs began construction "almost immediately." *Id.* ¶ 58. The oceanside deck and concrete pad were demolished; the contractor began to lay a foundation; and they purchased structural steel and other materials. *Id.* ¶¶ 58-59. During the construction, plaintiffs decided to add a fourth-floor balcony to their house. *Id.* ¶ 60. The balcony required a variance from the City's ten-foot setback requirement. *Id.*

On March 26, 2015, the City's Board of Zoning Appeals ("BZA") held a hearing in regard to the request for a variance. *Id.* ¶¶ 60-61. It did not go well for plaintiffs. A lawyer representing two Surf Village residents challenged the building permit for the Littles' expansion. *Id.* ¶ 62. The attorney confronted Smith "with the fact that the 1975 conveyance of Parcel A by Lynch to the City created a new side yard 10 ft. setback, which meant the permit did not comply with zoning requirements." *Id.* According to plaintiffs, Smith "admitted that he erred in calculating the setback as well as the parking requirements . . . ." *Id.* ¶ 64. As a result, the BZA rescinded the Littles' building permit and issued a stop work order. *Id.* ¶ 65.

The Littles received encouraging news on April 6, 2016. DNR informed them that it intended to return Parcel A to the City, as it was no longer needed for shoreline protection. *Id.* ¶ 68. The Littles spoke with McGean, who told them that they could purchase Parcel A from the City, thereby removing the zoning problems blocking their expansion. *Id.* ¶ 69.

On July 7, 2015, plaintiffs returned to the BZA, this time seeking an amendment to the Ordinance, which would allow them to build the addition. *Id.* ¶¶ 70-71. However, the BZA rejected their proposal, even though Smith had backed it. *Id.* ¶ 71.

Given this defeat, plaintiffs refocused their energies on facilitating the transfer of Parcel A from DNR to the City. *Id.* ¶ 73. The transfer cleared DNR's internal review process, *id.* ¶ 73, and was set for a vote by the Maryland Board of Public Works ("BPW") during its August 2016 session. *Id.* But, according to plaintiffs, Loran and Wilson "removed" Parcel A from BPW's agenda. *Id.* ¶ 76. In support of this contention, plaintiffs allege that on July 26, 2016, Loran met with Bruce Bereano, a lobbyist hired by Surf Village residents, to discuss BPW's agenda. *Id.* ¶ 79.

On August 1, 2016, Loran told McGean that DNR intended to attach use restrictions to Parcel A should it be transferred to the City. *Id.* ¶ 80. Plaintiffs claim that Loran acted maliciously and interfered with their vested property rights. *Id.* ¶ 82. Further, they allege that Bereano influenced Loran and Wilson "to impose additional arbitrary restrictions on the deed" to "prevent" the project from proceeding, and that he interfered with the City's agreement with plaintiff. *Id.* ¶ 84.

Loran met with McGean and Bereano on December 19, 2016, at DNR's office in Annapolis, to discuss the restrictions. *Id.* ¶ 89. Plaintiffs allege that, throughout January and February of 2017, Bereano "continued to seek the assistance" of Loran and Wilson to block the transfer of Parcel A. *Id.* ¶ 90.

Plaintiffs wrote to Wilson and McGean on March 6, 2017, stating "that the DNR's actions were arbitrary in nature and that the property, Parcel A should be returned to City in the same condition as the City had conveyed it to the DNR." *Id.* ¶ 92.

McGean presented DNR's proposed use restrictions to the City Council of Ocean City ("City Council") on March 28, 2017. *Id.* ¶ 93. During that meeting, he also provided the City Council with plaintiffs' letter to Wilson. *Id.* The City Council allegedly instructed McGean to relay to DNR that it disfavored the restrictions. *Id.* Plaintiffs represent that upon learning of the City Council's position, Loran decided DNR should retain ownership of Parcel A to avoid further controversy. *Id.* ¶ 94. Loran sent plaintiffs a letter on June 20, 2017, reiterating that DNR owns Parcel A and that plaintiffs have no rights to the land. *Id.* ¶ 95.

On October 2, 2017, plaintiffs contacted the City seeking reimbursement for the failed expansion. *Id.* ¶ 96. As of the filing of the suit, the City had not responded. *Id.* ¶ 98.

## II.    Standard of Review

As noted, both the City Defendants and the DNR Defendants have moved to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, and under Rule 12(b)(6) for failure to state a claim.

### A.  Rule 12(b)(1)

Under Rule 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction. *See Demetres v. East West Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *see also The Piney Run Preservation Ass'n v. Cty. Comm'rs of Carroll Cty.*, 523 F.3d 453, 459 (4th Cir. 2008); *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge, asserting that the allegations pleaded in the complaint are

insufficient to establish subject matter jurisdiction, or a factual challenge, asserting "'that the jurisdictional allegations of the complaint [are] not true.'" *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted); *accord Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013).

In a facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns*, 585 F.3d at 192. On the other hand, in a factual challenge, "the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction." *Id.* In that circumstance, the court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *see also United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347-48 (4th Cir. 2009); *Evans*, 166 F.3d at 647.

Both the City Defendants and the DNR Defendants raise a facial challenge to the Court's subject matter jurisdiction. Therefore, the Court looks to the four corners of the Amended Complaint.

### B.  Rule 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom. McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, *Miss.*, 574 U.S. 10, 10, 135 S. Ct. 346, 346 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of

action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion. *Edwards,* 178 F.3d at 243 (quoting *Republican Party v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992)). However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R.*

2

*Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman,* 494 F.3d at 464 (quoting *Forst,* 4 F.3d at 250) (emphasis added in *Goodman*).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). The court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville,* 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed v. Town of Gilbert, Ariz.*, 576 U.S. __, 135 S. Ct. 2218 (2015), *as recognized in Cahaly v. Larosa*, 796 F.3d 399 (4th Cir. 2015); *see Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007).

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)). Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

A court may also "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, __ U.S. __, 138 S. Ct. 558 (2017); *Oberg*, 745 F.3d at 136; *Kensington Volunteer Fire Dep't. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original). *See also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308,

322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

Moreover, in the context of a motion to dismiss, "[a] court may take judicial notice of docket entries, pleadings and papers in other cases without converting a motion to dismiss into a motion for summary judgment." *Brown v. Ocwen Loan Servicing, LLC*, PJM-14-3454, 2015 WL 5008763, at *1 n. 3 (D. Md. Aug. 20, 2015), *aff'd*, 639 F. App'x. 200 (4th Cir. May 6, 2016); *cf. Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n.1 (4th Cir. 1990) (holding that a district court may "properly take judicial notice of its own records"). But, "these facts [must be] construed in the light most favorable" to the non-movant. *Clatterbuck,* 708 F.3d at 557.

As noted, plaintiffs have attached two exhibits to the First Amended Complaint. ECF 37-1; ECF 37-2. ECF 37-1 is a twenty-page compilation of assorted documents. It contains seven maps as well as what appear to be letters and memoranda from DNR, the Maryland Department of Planning, and the Army Corps of Engineers. *See id.* The First Amended Complaint cites to Exhibit A generally; it does not specify, however, which document supports what factual allegation. *See e.g.*, ECF 37, ¶¶ 73, 76. Because the exhibits are attached to the Complaint, they may be considered. But, it is not the Court's job to decipher the relevance of the documents, without any guidance from plaintiffs.

ECF 37-2 is a land survey of plaintiffs' property, which was filed with the State of Maryland on April 19, 2007. *Id.* It is a legal instrument whose "very existence" has an operative

effect on the rights at issue in the suit.  *Severstal Sparrows Point, LLC*, at 794 F. Supp. 2d at 611.

Because there is no dispute as to its authenticity, and the survey is integral to plaintiffs' claims, it

is a proper subject of consideration under Rule 12(b)(6).

In addition, the DNR Defendants attached an exhibit to the DNR Motion.  *See* ECF 40-2.

The exhibit contains the deed recording the City's transfers of Parcel A to DNR on June 1, 2005.

Plaintiffs do not address whether the Court may consider the DNR Defendants' exhibit.  However,

this exhibit undergirds the First Amended Complaint insofar as plaintiffs allege that they possess

an easement to Parcel A.  Further, plaintiffs do not dispute the authenticity of the exhibits. And,

given that the deed was recorded, the Court may take judicial notice of it.  Accordingly, at this

juncture, I may consider ECF 40-2, without converting the motions to ones for summary judgment.

### III.    Motion to Strike

On the same day that the DNR Defendants filed their motion to dismiss, they also moved

to strike portions of plaintiffs' First Amended Complaint.  *See* ECF 39; ECF 40.

Rule 12(f) of the Federal Rule of Civil Procedure governs a motion to strike.  It provides:

> The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act:
>
> (1) on its own; or
>
> (2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

Matter is immaterial or impertinent if it is not relevant to the issues involved in the action.

*See Cobell v. Norton*, 224 F.R.D. 1, 5 (D.D.C. 2004); *see also Zaloga v. Provident Life and Acc.*

*Ins. Co. of Am.*, 671 F. Supp. 2d 623, 633 (M.D. Pa. 2009) ("'Immaterial matter is that which has

no essential or important relationship to the claim for relief.'" (citation omitted)); *Blevins v. Piatt*,

No. ELH-15-1551, 2015 WL 7878504, at *2 (D. Md. Dec. 4, 2015).  A court may not, however,

strike matter as immaterial where the relevance of allegations may turn on disputed issues of fact or law. *See Rackley v. Bd. Trustees of Orangeburg Reg'l Hosp.*, 310 F.2d 141, 143 (4th Cir. 1962) (holding the district court erred in striking a paragraph in the complaint where "it did not conclusively appear that this circumstance was not germane to the claimants' case"); *accord Greater Northern Ins. Co. v. Recall Total Info. Mgmt., Inc.*, No. TDC-13-1829, 2014 WL 5298014, at *4 (D. Md. Oct. 14, 2014). Scandalous material is that which "'unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court.'" *Cobell*, 244 F.R.D. at 5 (citation omitted).

"Rule 12(f) motions are generally viewed with disfavor because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic." *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001) (internal quotation marks and citations omitted). Therefore, "[w]hen reviewing a motion to strike, 'the court must view the pleading under attack in a light most favorable to the pleader.'" *Piontek v. Serv. Ctrs. Corp.*, No. PJM 10-1202, 2010 WL 4449419, at *8-9 (D. Md. Nov. 5, 2010) (quoting *Clark v. Milam*, 152 F.R.D. 66, 71 (S.D. W. Va. 1993)). And, in determining whether to grant a motion to strike, the court "enjoys wide discretion . . . in order 'to minimize delay, prejudice and confusion by narrowing the issues for discovery and trial.'" *Haley Paint Co. v. E.I. du Pont de Nemours & Co.*, 279 F.R.D. 331, 335 (D. Md. 2012) (quoting *Hayne v. Green Ford Sales, Inc.*, 263 F.R.D. 647, 649 (D. Kan. 2009)).

In its Motion to Strike, the DNR Defendants ask the Court to strike the following portions of the First Amended Complaint, ECF 39-1 at 4-6:

1. The photograph on page 4, which allegedly depicts Parcel A;

2. A photograph on page 5, captioned "pictures of the pilings, easement and area of the intended addition," which purports to show plaintiffs' oceanside deck;

3. A photograph on page 6, depicting plaintiffs' deck and concrete pad;

4. Citations to case law in Paragraphs 10, 13, 36, 105, 114, 119, Prayer for Relief (d) and (e);

5. The citation to a local ordinance in Paragraph 24;

6. The section titled, "Legal Basis For Equitable and Declaratory Relief";

7. The quotations to § 1983 in Paragraphs 104 and 109; and

8. The citations to case law in footnotes 15, 16, 17, and 18.

9. Exhibit A.

The photographs are not scandalous. Arguably, they are not allegations, statements, or written instruments, as contemplated by Rules 8 and 10. However, in the context of this case, they serve to illustrate the factual averments. Even if the case were to reach a jury, it is not clear that the Amended Complaint would be provided to the jury. But, any improper legal citations could easily be redacted, thereby curing any potential prejudice.

With respect to Exhibit A, the gravamen of DNR Defendants' challenge is that "[t]he contents of the Exhibit are not described or identified in the First Amended Complaint." ECF 39-1 at 6. The exhibit contains memoranda by DNR and the Department of Planning concerning Parcel A, a letter addressed from the Army Corps of Engineers to Loran, and schematics and images of plaintiffs' property. *See* ECF 37.

The DNR Defendants are correct that the First Amended Complaint does not explain these documents. Further, the First Amended Complaint only references the exhibit in general terms, leaving the reader to guess which document supports the allegation. *See, e.g.*, ECF 37, ¶¶ 6, 73,

76. But, that alone is not a sufficient basis for the harsh medicine of Rule 12(f). That is especially so when the DNR Defendants failed to explain how they are prejudiced by Exhibit A. *See Waste Mgmt. Holdings, Inc.*, 252 F.3d at 347.

Finally, I agree that the 18 footnotes in the First Amended Complaint are inappropriate. However, they are easily disregarded. Accordingly, in the exercise of my discretion, I shall deny the Motion to Strike (ECF 39), which I regard as a dilatory tactic.

### IV. Motions to Dismiss

### A. Section 1983 Generally

Plaintiffs have filed suit against the City and DNR Defendants under 42 U.S.C. § 1983. Specifically, Count One lodges a *Monell* claim against the City under § 1983, asserting violations of due process and the Takings Clause. ECF 37 at 26-27. And, Count Two alleges that the DNR Defendants are liable in their individual and official capacities under § 1983 for violating plaintiffs' due process rights and effectuating an uncompensated taking of their property. *Id.* at 27-28.

Pursuant to 42 U.S.C. § 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 135 S. Ct. 1893 (2015). However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).

In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd*., 526 U.S. 687, 707 (1999). "The first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245.

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997). The phrase "under color of state law" is an element that "is synonymous with the more familiar state-action requirement—and the analysis for each is identical." *Philips v. Pitt Cty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citing *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929 (1982)). A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk County v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181 ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient." (Citations and internal quotation marks omitted)).

Section 1983 also requires a showing of personal fault based upon a defendant's personal conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights). In other words, there is no

respondeat superior liability under § 1983. *Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

Liability of supervisory officials under § 1983 "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). With respect to a supervisory liability claim in a § 1983 action, a plaintiff must allege:

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994); *see also Wilcox*, 877 F.3d at 170.

### B. Monell Claim – Count One

In Count One, plaintiffs lodge a § 1983 claim against Ocean City based on *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). ECF 37 at 26-27.[4]

---

[4] As noted, the caption of Count One specifically identifies the City as the only defendant against whom Count One is lodged. ECF 37 at 26. In construing Count One, I conclude that plaintiffs have not asserted Count One against Smith or McGean, in either their individual or official capacities. *See United States v. A.H. Fischer Lumber Co.*, 162 F.2d 872, 873 (4th Cir. 1947) (observing that a defendant "ha[s] the right to be accurately named in the process and pleadings").

Plaintiffs assert, *inter alia*, that the City, through its agents, the individual defendants, "violated the custom, policies, or practices" of the City and DNR. In other words, plaintiffs suggest that the conduct was contrary to customs and policies that protected plaintiffs' rights. They have not stated a *Monell* claim.

In *Monell*, the Supreme Court determined that a municipality is subject to suit under § 1983 based on the unconstitutional actions of individual defendants, but only where those defendants were executing an official policy or custom of the local government that violated the plaintiff's rights. *Id.* at 690-91; *see also Lozman v. City of Riviera Beach*, ___ U.S. ___, ___, 138 S. Ct. 1945, 1951 (2018) ("It is well established that in a § 1983 case a city or other local governmental entity cannot be subject to liability at all unless the harm was caused in the implementation of 'official municipal policy.'" (quoting *Monell*, 436 U.S. at 691)). As the *Monell* Court said, 436 U.S. at 694, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible under § 1983." *See also Love-Lane*, 355 F.3d at 782. But, liability attaches "only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original); *accord Holloman v. Markowski*, 661 F. App'x 797, 799 (4th Cir. 2016) (per curiam), *cert. denied*, 137 S. Ct. 1342 (2017).

In *Connick v. Thompson*, 563 U.S. 51, 60 (2011), the Supreme Court explained, *id.* at 1359 (emphasis in *Connick*):

> A municipality or other local government may be liable under [§ 1983] if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 692 (1978). But, under § 1983, local governments are responsible only for "their *own* illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986) (citing *Monell*, 436 U.S. at 665-683). They are not vicariously

liable under § 1983 for their employees' actions.  *See id.*, at 691; *Canton*, 489 U.S. at 392; *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 [] (1997) (collecting cases).

Thus, a viable § 1983 *Monell* claim consists of two components: (1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights.  *See, e.g.*, *Bd. of Comm'rs of Bryan Cty., v. Brown*, 520 U.S. 397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 451 (4th Cir. 2004), *cert. denied*, 547 U.S. 1187 (2006); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

Yet here, plaintiffs seem to allege that the City violated the customs and policies of the City that protect the rights of the plaintiffs.  In other words, it is not that the City has an unconstitutional policy.  Rather, it allegedly breached a policy that inured to the benefit of plaintiffs.  However, to impose liability on a municipality, a plaintiff must "adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation" of constitutional rights.  *Jordan by Jordan v. Jackson,* 15 F.3d 333, 338 (4th Cir. 1994).

"Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality."  *Bd. of Comm'rs of Bryan Cty.*, 520 U.S. at 403-04.  A plaintiff may demonstrate the existence of an official policy in three ways: (1) a written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) in certain omissions made by policymaking officials that "manifest deliberate indifference to the rights of citizens."  *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999).

"An official policy often refers to 'formal rules or understandings . . . that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and

over time,' and must be contrasted with 'episodic exercises of discretion in the operational details of government.'" *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (alteration in *Semple*; citations omitted). But, "the governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances." *Id.*

Notably, "[o]utside of such formal decisionmaking channels, a municipal custom may arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" *Carter*, 164 F.3d at 218 (quoting *Monell*, 436 U.S. at 691); *see Simms ex rel. Simms v. Hardesty*, 303 F. Supp. 2d 656, 670 (D. Md. 2003). A custom "may be attributed to a municipality when the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987); *see Holloman*, 661 F. App'x at 799. In addition, "a policy or custom may possibly be inferred from continued inaction in the face of a known history of widespread constitutional deprivations on the part of city employees, or, under quite narrow circumstances, from the manifest propensity of a general, known course of employee conduct to cause constitutional deprivations to an identifiable group of persons having a special relationship to the state." *Milligan*, 743 F.2d at 229 (internal citations omitted).

Under the condonation theory of liability, "a city violates § 1983 if municipal policymakers fail 'to put a stop to or correct a widespread pattern of unconstitutional conduct.'" *Owens*, 767 F.3d at 402 (quoting *Spell*, 824 F.2d at 1389). In such a case, however, a plaintiff must show "a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" *Owens*, 767 F.3d at 402 (quoting *Spell*, 824

F.2d at 1386-1391). Both "knowledge and indifference can be inferred from the 'extent' of employees' misconduct." *Owens*, 767 F.3d at 402-03 (quoting *Spell*, 824 F.2d at 1391). But, only "'widespread or flagrant'" misconduct is sufficient. *Owens*, 767 F.3d at 403 (quoting *Spell*, 824 F.2d at 1387). In contrast, "[s]poradic or isolated" misconduct is not. *Owens*, 767 F.3d at 403.

A policy or custom that gives rise to § 1983 liability will not, however, "be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." *Milligan*, 743 F.2d at 230. Only when a municipality's conduct demonstrates a "deliberate indifference" to the rights of its inhabitants can the conduct be properly thought of as a "policy or custom" actionable under § 1983. *Jones v. Wellham*, 104 F.3d 620, 626 (4th Cir. 1997) (citing *Canton*, 489 U.S. at 389).

Notably, a municipality cannot be held liable in a § 1983 action under a theory of *respondeat superior*. *Monell*, 436 U.S. at 693-94. Rather, "[l]iability arises only where the constitutionally offensive acts of city employees are taken in furtherance of some municipal 'policy or custom.'" *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984) (citing *Monell*, 436 U.S. at 694). In other words, a municipality is liable when a "policy or custom" is "fairly attributable to the municipality as its 'own,' and is . . . the 'moving force' behind the particular constitutional violation." *Spell*, 824 F.2d at 1387 (internal citations omitted); *see Moore v. Howard Cty Police Dep't*, No. CCB-10-1430, 2010 WL 4722043 at *2 (D. Md. Nov. 15, 2010).

In Count One, plaintiffs assert that "[t]he conduct of the individual Defendants and Defendant City, through their agents . . . violated the customs, policies, or practices of the Defendant City or DNR" and that this "violated the constitutional and property rights of Plaintiffs[.]" ECF 37, ¶ 105. To be sure, Count One incorporates over 100 paragraphs of allegations. *See* ECF 37, ¶ 103. But, apart from the plaintiffs' conclusory assertion, plaintiffs do

not identify any specific policy, custom, or practice attributable to Ocean City that relates to the denial of plaintiffs' rights. Nor does the Complaint describe a "'persistent and widespread'" practice that is "'so permanent and well settled as to constitute a custom or usage with the force of law.'" *Carter*, 164 F.3d at 218 (quoting *Monell*, 436 U.S. at 691). And, plaintiffs do not allege with any particularity how a policy, custom, or practice of the City was the proximate cause of a due process violation or an unconstitutional taking.

The threadbare allegations are insufficient to raise a plausible *Monell* claim. *See, e.g., Lyles v. Prawdzik*, No. 15-cv-1056-PWG, 2016 WL 3418847, at *5 (D. Md. June 22, 2016) ("[B]oilerplate allegations are not sufficient to plead . . . *Monell* claims[.]"); *Ross v. Prince George's Cty.*, No. 11-cv-1984-DKC, 2012 WL 1204087, at *9 (D. Md. Apr. 10, 2012) (dismissing plaintiff's *Monell* claim because the complaint "wholly fails . . . to support [his] bald conclusion with any factual allegations"); *Lee v. O'Malley*, 533 F. Supp. 2d 548, 553 (D. Md. 2007) (emphasizing that "conclusory" statements are insufficient to support municipal liability under *Monell*). Accordingly, I shall dismiss plaintiffs' *Monell* claim, lodged against the City in Count One.

### C. Sovereign Immunity – Count Two

In Count Two, plaintiffs allege that the DNR Defendants violated their constitutional rights while acting in their official capacity as officers of DNR. ECF 37, ¶¶ 13-15, 110-12. The DNR Defendants argue that they are not subject to suit under § 1983 in their official capacity, because a suit against them in their official capacity is tantamount to a suit against the State. ECF 40-1 at 16 (citing *Proctor v. Wells Fargo Bank, N.A.*, 289 F. Supp. 3d 676, 686 (D. Md. 2018)). They maintain that sovereign immunity bars plaintiffs' § 1983 claim against them in their official capacity, to the extent plaintiffs seek money damages and retrospective injunctive relief. ECF 40-

1 at 16-17.  Plaintiffs did not respond to the DNR Defendants' contention that they are immune from suit in their official capacity.  *See* ECF 45.

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another state, or by Citizens or subjects of any Foreign State."  U.S. Const. amend XI.

Under the Eleventh Amendment, states generally enjoy immunity from suits brought in federal court by their own citizens.  *See Hans v. Louisiana*, 134 U.S. 1, 3 (1890); *see also Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting states may not be sued by private individuals in federal court.").  Therefore, absent consent or a valid congressional abrogation of sovereign immunity, the Eleventh Amendment bars a private individual from bringing suit against a state in federal court to recover damages, unless there is an exception to sovereign immunity.  *See Coleman v. Court of Appeals of Md.*, 556 U.S. 30, 35 (2012) ("A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense."); *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247 (2011); *see also Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54-55 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States.") (internal quotation marks and citation omitted); *Edelman v. Jordan*, 415 U.S. 651 (1974).[5]

---

[5] State sovereign immunity "is an immunity from private suit; it does not . . . bar federal enforcement actions."  *Passaro v. Virgina*, 935 F.3d 243, 248 (4th Cir. 2019) (citing *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 71 n.14 (1996)).

The Eleventh Amendment did not create sovereign immunity, however. Rather, it preserved the sovereign immunity that the states enjoyed prior to the formation of the Union. *See Alden v. Maine*, 527 U.S. 706, 724 (1999); *see also Sossamon v. Texas*, 563 U.S. 277, 284 (2011). State sovereign immunity "accord[s] states the dignity that is consistent with their status as sovereign entities[.]" *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002).

The Fourth Circuit recently reiterated that the defense of sovereign immunity is a jurisdictional bar, stating that "'sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction.'" *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (quoting *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 207 (5th Cir. 2009)). Moreover, a defendant "bears the burden of demonstrating" sovereign immunity, because it is "akin to an affirmative defense." *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014).

Of relevance here, state sovereign immunity also bars suit against an instrumentality of a state, sometimes referred to as an "arm of the state," including state agencies. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *see also Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *Pense v. Maryland Dep't of Pub. Safety & Corr. Servs.*, 926 F.3d 97, 100 (4th Cir. 2019) *McCray v. Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014); *Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013); *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 479 (4th Cir. 2005).

The Fourth Circuit has noted three exceptions to the Eleventh Amendment's prohibition of suits against a state or an arm of the state. In *Lee-Thomas v. Prince George's County Public Schools*, 666 F.3d 244 (4th Cir. 2012), the Court said, *id.* at 249 (internal quotations omitted):

> First, Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority. *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) . . . . Second, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) . . . . Third, a State remains free to waive its Eleventh Amendment immunity from suit in a federal court. *Lapides v. Bd. of Regents of Univ. Sys. of Ga.,* 535 U.S. 613, 618 (2002).

Notably, sovereign immunity has not been congressionally abrogated for claims under § 1983. *See Quern v. Jordan*, 440 U.S. 332 (1979). In *Quern*, 440 U.S. at 345, the Supreme Court concluded that suits by individuals against a state for money damages under § 1983 are barred by the Eleventh Amendment. *Id.* ("[Section] 1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States[.]").

A state may waive its Eleventh Amendment sovereign immunity and permit suit in federal court. *See Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002); *see Pense*, 926 F.3d at 101; *Lee-Thomas*, 666 F.3d at 249. But, the test to determine whether a state has waived its immunity from suit in federal court is a "stringent" one. *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 240 (1985), *superseded on other grounds, as recognized in Lane v. Pena*, 518 U.S. 187, 198 (1996); *see Pense*, 939 F.3d at 101. Under *Atascadero*, 473 U.S. at 254, a court may find that a state has waived its Eleventh Amendment immunity "only where stated by the most express language or by such overwhelming implication from the text as will leave no room for any other reasonable construction." (Internal quotation marks and alteration omitted); *accord Pense*, 926 F.3d at 101; *Lee-Thomas*, 666 F.3d at 250-51.

And, under *Ex parte Young*, 209 U.S. 123 (1908), sovereign immunity does not extend to a request for prospective injunctive relief to correct an ongoing violation of law. However, to avoid an Eleventh Amendment bar to suit on this basis, the complaint must be lodged against a state official, and it must "alleg[e] an ongoing violation of federal law and see[k] relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).

"Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989) (quoting *Kentucky v. Graham*, 473 U.S. 159, 167, n. 14 (1985)); *see also Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 269 (1997) (recognizing exception to Eleventh Amendment immunity for certain suits seeking declaratory and injunctive relief against state officers in their individual capacities); *Bland*, 730 F.3d at 390 ("Because reinstatement is a form of prospective relief, the refusal to provide that relief when it is requested can constitute an ongoing violation of federal law such that the *Ex parte Young* exception applies.").

As discussed, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will*, 491 U.S. at 71; *see also Kentucky*, 473 U.S. at 165 ("[Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent." (internal quotation marks omitted)). Thus, plaintiffs' § 1983 claim in Count Two against the DNR Defendants in their

official capacity is, in effect, lodged against DNR.  And, DNR is indisputably an arm of the State of Maryland.

Congress has not abrogated Eleventh Amendment immunity through § 1983.  And, the Maryland General Assembly has expressly declined to waive its sovereign immunity as to claims in federal court.  *See* Md. Code, State Gov't § 12-103(2) (stating that the Maryland Tort Claims Act does not "waive any right or defense of the State or its units, officials, or employees in an action in a court of the United States . . . including any defense that is available under the 11th Amendment to the United States Constitution").  It follows that the DNR Defendants are immune from suit in their official capacity.

Therefore, Count Two is subject to dismissal under Rule 12(b)(1), to the extent that plaintiffs seek damages or retrospective injunctive relief against the DNR Defendants in their official capacities.

### D.  Qualified Immunity – Count Two

As noted, Count Two is also lodged against the individual DNR Defendants in their individual capacity.  The DNR Defendants assert that they are protected from suit in their individual capacity based on qualified immunity.  In this regard, they argue that their conduct did not violate any clearly established constitutional right of which a reasonable public official should have known.  ECF 38-1 at 21 n.4; ECF 40-1 at 18-20.

Plaintiffs insist that the DNR Defendants are not entitled to qualified immunity.  They aver that their property rights in Parcel A "were settled by Maryland law and hence clearly established at the time of the violation."  ECF 45 at 4.

 "Qualified immunity shields government officials who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were

lawful." *Hunter v. Town of Mocksville, N.C.*, 789 F.3d 389, 401 (4th Cir. 2015) (internal quotations omitted); *see also Hupp v. Cook*, 931 F.3d 307, 317 (4th Cir. 2019); *Sims v. Labowitz*, 885 F.3d 254, 260 (4th Cir. 2018); *Humbert v. Mayor and City Council of Baltimore City*, 866 F.3d 546, 555 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 2602 (2018); *Osborne v. Georgiades*, 679 F. App'x 234, 237 (4th Cir. 2017); *Scinto v. Stansberry*, 841 F.3d 219, 235 (4th Cir. 2016). Put another way, it "takes cognizance of human imperfections," *West v. Murphy*, 771 F.3d 209, 213 (4th Cir. 2014), and protects government officials from liability for "'bad guesses in gray areas.'" *Brawn v. Maynard*, 652 F.3d 557, 560 (4th Cir. 2011) (citation omitted); *see Safar*, 859 F.3d at 245.

In *Owens*, 767 F.3d at 395, the Fourth Circuit reiterated: "Qualified immunity protects government officials from liability for 'civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (Quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The cases are legion in support of this proposition. *See, e.g., District of Columbia v. Wesby*, 583 U.S. ___, ___, 137 S. Ct. 577, 589 (2018); *Reichle v. Howards*, 566 U.S. 658, 664 (2012); *Saucier v. Katz*, 533 U.S. 194, 206 (2001); *Williamson v. Stirling*, 912 F.3d 154, 186 (4th Cir. 2018); *Wilson v. Prince George's Cty.*, 893 F.3d 213, 219 (4th Cir. 2018); *Spivey v. Norris*, 731 F. App'x 171, 175 (4th Cir. 2018); *O'Neal v. Rollyson*, 729 F. App'x 254, 255 (4th Cir. 2018) (per curiam); *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 582-83 (4th Cir. 2017); *Goines*, 822 F.3d at 170; *Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th Cir. 2013); *Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir. 2012), *cert. denied*, 568 U.S. 1068 (2012). Thus, "a government official who is sued in his individual capacity may invoke qualified immunity." *Bland*, 730 F.3d at 391; *see Harlow*, 457 U.S. at 818.

Notably, qualified immunity is an "'*immunity from suit* rather than a mere defense to

liability[.]'" *Ussery v. Mansfield*, 786 F.3d 332, 337 (4th Cir. 2015) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (emphasis in *Mitchell*). Accordingly, the immunity is "'effectively lost if a case is erroneously permitted to go to trial.'" *Ussery*, 786 F.3d at 337 (quoting *Mitchell*, 472 U.S. at 526).

As the Supreme Court has explained, "[q]ualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231; *see Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *accord Stanton v. Sims*, 571 U.S. 3, 5-6 (2013) (per curiam). Moreover, "[t]he protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 555 U.S. at 231 (citation omitted). But, an official is not entitled to qualified immunity if he deprived an individual of a constitutional right and that right was clearly established at the time of the violation. *Id.*

Qualified immunity turns on the "objective reasonableness of an official's conduct, as measured by reference to clearly established law," *Harlow*, 457 U.S. at 818, and so an officer who makes an honest but objectively unreasonable mistake is not protected by qualified immunity. The doctrine protects officials "'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'" *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (citation omitted); *accord Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012). In other words, qualified immunity "'gives government officials breathing room

to make reasonable but mistaken judgments about open legal questions.'" *Lane v. Franks*, 573 U.S. 228, 243 (2014) (quoting *al-Kidd*, 563 U.S. at 743). However, "[b]ecause an official 'who performs an act clearly established to be beyond the scope of his discretionary authority is not entitled to claim qualified immunity,' the defendant bears the initial burden 'of demonstrating that the conduct of which the plaintiff complains falls within the scope of the defendant's duties.'" *Henry v. Purnell*, 501 F.3d 374, 377 n.2 (4th Cir. 2007).

The qualified immunity analysis involves two inquiries: (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a constitutional [or statutory] right," *Saucier*, 533 U.S. at 201; and (2) whether the right at issue "'was clearly established in the specific context of the case—that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'" *Merchant*, 677 F.3d at 662 (quoting *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002)); *see Wesby*, 138 S. Ct. at 589; *Tolan v. Cotton*, 572 U.S. 650, 655 (2014) (per curiam); *Ray*, 781 F.3d at 100; *Owens,* 767 F.3d at 395-96. As the Fourth Circuit has explained: "In determining whether defendant government officials are protected by qualified immunity, the court considers both 'whether a constitutional right [was] violated on the facts alleged' and 'whether the right was clearly established' at the time of the conduct in question." *Scinto*, 841 F.3d at 235 (citations omitted); *see also Cannon v. Village of Bald Head Island, NC*, 891 F.3d 489, 497 (4th Cir. 2018). The "two inquiries . . . may be assessed in either sequence." *Merchant*, 677 F.3d at 661-62; *accord Labowitz*, 885 F.3d at 260; *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018).

If an officer is shown to have violated the rights of a plaintiff, courts must then "evaluate whether the right at issue was 'clearly established' at the time of the officer's

conduct.[] Accordingly, even when the facts in the record establish that the officer's conduct violated a plaintiff's constitutional rights, the officer still is entitled to immunity from suit 'if a reasonable person in the [officer's] position could have failed to appreciate that his conduct would violate those rights.'" *Wilson*, 893 F.3d at 219 (quoting *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991)) (other citation omitted); *see Williams v. Strickland*, 917 F.3d 763, 768 (4th Cir. 2019); *see also Greene v. Feaster*, 733 F. App'x 80, 82 (4th Cir. 2018) (per curiam) ("Even when a prison official [is shown to have violated a constitutional right of a plaintiff], qualified immunity will shield him from liability as long as his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'") (quoting *Goines*, 822 F.3d at 170).

The second inquiry "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). If the law at the time of the alleged violation was not "clearly established," the official will be entitled to qualified immunity, because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818. On the other hand, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id.* at 818-19.

To determine whether the right was clearly established, the court first must define the right at issue. *Scinto,* 841 F.3d at 235; *see Occupy Columbia*, 738 F.3d at 118. "A right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.'" *Carroll v. Carman*, 574 U.S. 13, ___, 135 S. Ct. 348,

350 (2014) (per curiam) (quoting *Creighton*, 483 U.S. at 640). Notably, "a right may be clearly established by any number of sources, including a . . . case, a statute, or the Constitution itself." *Owens*, 767 F.3d at 399.

Generally, to "determine whether a right is clearly established," courts "assess whether the law has 'been authoritatively decided by the Supreme Court,[] the appropriate United States Court of Appeals, or the highest court of the state.'" *Wilson*, 893 F.3d at 221 (citation omitted); *see Doe ex rel. Johnson v. S.C. Dept. of Soc. Servs.*, 597 F.3d 163, 176 (4th Cir. 2010) (stating that "'ordinarily [courts] need not look beyond the decisions of the Supreme Court, [the Fourth Circuit], and the highest court of the state in which the case arose'" as of the date of the conduct at issue), *cert. denied*, 562 U.S. 890 (2010). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Carroll*, 135 S. Ct. at 350 (quoting *al-Kidd*, 563 U.S. at 741); *see Kisela v. Hughes*, 584 U.S. ___, ___, 138 S. Ct. 1148, 1152 (2018); *White v. Pauly,* 580 U.S. ___, __, 137 S. Ct. 548, 551 (2017) (per curiam); *San Francisco v. Sheehan*, 575 U.S. ___, ___, 135 S. Ct. 1765, 1774 (2015); *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014); *see also Reichle*, 132 S. Ct. at 2093 ("To be clearly established, a right must be sufficiently clear that 'every reasonable official would [have understood] that what he is doing violates that right.'") (citation and some quotation marks omitted).

However, "[a] right need not be recognized by a court in a specific factual context before such right may be considered 'clearly established' for purposes of qualified immunity." *Wilson*, 893 F.3d at 221 (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)); *Thompson v. Virginia*, 878 F.3d 89, 98 (4th Cir. 2017) ("[A] 'general constitutional rule . . . may apply with obvious clarity . . . even though the very action in question has not previously been held unlawful.'") (quoting *Hope*, 536 U.S. at 741); *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 544 (4th Cir. 2017). Indeed, the

Supreme Court has never required a "'case directly on point for a right to be clearly established.'" *Kisela*, 138 S. Ct. at 1152 (quoting *White*, 137 S. Ct. at 551); *see al-Kidd*, 563 U.S. at 741; *see also Crouse*, 848 F.3d, at 582-83. But, "courts are 'not to define clearly established law at a high level of generality.'" *Wilson*, 893 F.3d at 221 (quoting *Kisela*, 138 S. Ct. at 1152); *see also Sheehan*, 135 S. Ct. at 1775-76; *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014). Therefore, courts are to "consider whether a right is clearly established 'in light of the specific context of the case, not as a broad general proposition.'" *Adams*, 884 F.3d at 227 (quoting *Mullenix v. Luna*, 577 U.S. ___, ___, 136 S. Ct. 305, 308 (2015)) (per curiam).

The central question is "whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted." *See Raub v. Campbell*, 785 F.3d 876, 882 (4th Cir. 2015). To defeat qualified immunity, "'the existing authority must be such that the unlawfulness of the conduct is manifest.'" *Merchant*, 677 F.3d at 665 (quoting *Layne*, 141 F.3d at 114); *see Bland*, 730 F.3d at 391 (stating that "[f]or a plaintiff to defeat a claim of qualified immunity, the contours of the constitutional right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right") (internal quotations omitted).

As will be apparent in the discussion, *infra*, plaintiffs' purported constitutional rights are anything but "clearly established." Rather, whether plaintiffs have alleged a property interest that can support their due process and takings claims hinges on deeply unsettled questions of State law. Thus, even assuming the DNR Defendants violated plaintiffs' constitutional rights, they would nonetheless be entitled to qualified immunity from liability in their personal capacity. *See, e.g., Natale v. Town of Ridgefield*, 927 F.2d 101, 105 (2d Cir. 1991) (zoning commission president enjoyed qualified immunity "because there was ample justification for [his] determination that the

[landowners] did not have a right to the permits in question, [so] it was objectively reasonable for [him] to believe that his actions would not deny them of any constitutionally protected rights.").

Accordingly, I shall dismiss Count Two against the DNR Defendants to the extent that it seeks monetary damages against them in their individual capacities.

### E. Burford Abstention – Counts Two and Eight

As noted, this case is rooted in plaintiffs' efforts to enlarge their townhouse in Ocean City. The Littles' claims are predicated on their assertion of rights in regard to an easement over a parcel adjoining their property and/or vested property rights, based on a building permit issued by the City that was later recalled. Plaintiffs assert, *inter alia*, that by blocking the renovation, the City and the DNR Defendants have violated plaintiffs' due process and property rights under the Fifth and Fourteenth Amendments to the United States Constitution.

I have already dismissed Count One, to the extent that plaintiffs lodge a *Monell* claim against the City. Further, I have dismissed Count Two, which presents a § 1983 claim against the DNR Defendants, to the extent that the count is asserted against the DNR Defendants in their official capacity, and to the extent that the count seeks monetary damages against them in their individual capacity. The federal claims that remain are Count Two, to the extent that it seeks declaratory and prospective injunctive relief against the DNR Defendants, and Count Eight, which alleges a claim against the City for an uncompensated taking, in violation of the Fifth and Fourteenth Amendments.

Regarding Count Two, it appears that plaintiffs premise their § 1983 claim against the DNR Defendants on the DNR Defendants' refusal to recognize plaintiffs' easement to Parcel A. ECF

at 27-28.  In Count Eight, plaintiffs assert that the rescission of the 2015 building permit by Ocean City constituted an unlawful taking.  *See id.* at 32-33.

The City asserts in its motion that plaintiffs lack a protectable property interest in either Parcel A or the 2015 building permit, a threshold requirement to state a plausible due process or takings violation.  ECF 38-1 at 3-15.  The DNR Defendants argue, *inter alia*, that the plaintiffs do not, as a matter of law, possess a property interest in Parcel A.  ECF 40-1 at 22-31.  But, they also urge the Court to apply either *Pullman* or *Burford* abstention.  *Id.* at 10-16.

In response, plaintiffs strenuously argue that they have established a plausible property interest in both Parcel A and the 2015 building permit.  *See* ECF 44 at 3-6; ECF 45 at 2-4, 5-7. The parties spill much ink on plaintiffs' property rights—a question dependent on Maryland land use law.  I conclude that *Burford* abstention applies to these claims.

### 1.  Background

"'[A] federal court's obligation to hear and decide' cases within its jurisdiction 'is virtually unflagging.'"  *Lexmark Intern., Inc. v. Static Control Components, Inc*., 572 U.S. 118, 126 (2014) (quoting *Sprint Comm., Inc. v. Jacobs*, 571 U.S. 69, 77 (2013)); *see Mata v. Lynch*, ___ U.S. ___, ___, 135 S. Ct. 2150, 2156 (2015); *England v. La. State Bd. of Med. Exam'rs*, 375 U.S. 411, 415 (1964) ("'When a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction.'" (citation omitted)); *accord Wash. Gas Light Co. v. Prince George's Cty. Council*, 711 F.3d 412, 418 (4th Cir. 2013).  Nonetheless, the Supreme Court has recognized several carefully delineated categories of cases where a federal court may abstain from deciding a case properly before it.  *See New Orleans Pub. Serv. Inc. v. Cty. Council of New Orleans*, 491 U.S. 350, 359 (1989).

Pursuant to *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), a federal court may, in its discretion, use its equitable owners to abstain from consideration of cases over which it has jurisdiction in order to show "'proper regard for the rightful independence of state governments in carrying out their domestic policy.'" *Id.* at 318 (citation omitted). To be sure, abstention is "the exception, not the rule." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976); *accord United States v. South Carolina*, 720 F.3d 518, 526 (4th Cir. 2013); *see also Martin v. Stewart*, 499 F.3d 360, 363 (4th Cir. 2007) ("[T]he abstention doctrines constitute 'extraordinary and narrow exception[s]' to a federal court's duty to exercise the jurisdiction conferred on it." (quoting *Quackenbush v. Allstate Ins. Co*., 517 U.S. 706, 716 (1996))).

In *Johnson v. Collins Entm't Co., Inc.*, 199 F.3d 710, 718-19 (4th Cir. 1999), the Fourth Circuit said: "Although th[e] doctrine has many different forks and prongs, its central idea has always been one of simple comity." Thus, *Burford* abstention "safeguards our federal system from the '[d]elay, misunderstanding of local law, and needless conflict with [a] state policy' that inevitably results from federal judicial intrusions into areas of core state prerogative." *Id.* at 719 (quoting *Burford*, 319 U.S. at 327); *see also Town of Nags Head v. Toloczko*, 728 F.3d 391, 395 (4th Cir. 2013) (*Burford* abstention "advances federal and state comity" by preventing "an incorrect federal decision" from "embarrass[ing] or disrupt[ing] significant state policies" (citation omitted)).

In *Burford*, Sun Oil Company challenged the validity of an order of the Texas Railroad Commission ("Commission") granting Burford a permit to drill four oil wells on land in east Texas. 319 U.S. at 317. The Supreme Court noted that the case was arguably an "'appeal' from the Commission." *Id.* Moreover, it observed that the order was "part of the general regulatory

system devised for the conservation of oil and gas in Texas, an aspect of 'as thorny a problem as has challenged the ingenuity and wisdom of legislatures.'" *Id.* at 318 (citation omitted).

In view of the sophistication of the state administrative process, the Supreme Court determined: "Insofar as we have discretion to do so, we should leave these problems of Texas law to the State court where each may be handled as 'one more item in a continuous series of adjustments.'" *Id.* at 332. It concluded, *id.* at 333-34:

> The state provides a unified method for the formation of policy and determination of cases by the Commission and by the state courts. The judicial review of the Commission's decisions in the state courts is expeditious and adequate. Conflicts in the interpretation of state law, dangerous to the success of state policies, are almost certain to result from the intervention of the lower federal courts. On the other hand, if the state procedure is followed from the Commission to the State Supreme Court, ultimate review of the federal questions is fully preserved here. *Cf. Matthews v. Rodgers*, 284 U.S. 521. Under such circumstances, a sound respect for the independence of state action requires the federal equity court to stay its hand.

The Court clarified its *Burford* decision in *New Orleans Public Services, Inc. v. Council of City of New Orleans*, 491 U.S. 350 (1989) ("NOPSI"). In *NOPSI*, an electrical utility filed suit challenging the decision of a local rate-making body concerning a proposed electricity rate increase. *Id.* at 352-53. The district court dismissed the case, finding, *inter alia*, that abstention was proper under *Burford*. *Id.* at 355-56, 357. The Fifth Circuit affirmed. *Id.* at 358.

The case was then heard by the Supreme Court, which explained, *id.* at 361:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

Although the *NOPSI* Court recognized that *Burford* is "concerned with protecting complex state administrative processes from undue federal interference" (*id.* at 362), it explained that

2

*Burford* "does not require abstention whenever there exists such a process, or even in all cases where there is a 'potential for conflict' with state regulatory law or policy." *Id.* (citation omitted). Because the facts in *NOPSI* did not "demand significant familiarity with, and [would] not disrupt state resolution of, distinctively local regulatory facts or policies," the Supreme Court determined that *Burford* abstention was not appropriate. *Id.* at 364.

The Fourth Circuit has applied *Burford* abstention to state and local land use and zoning cases. *Wash. Gas Light*, 711 F.3d at 419; *MLC Auto., LLC v. Town of S. Pines*, 532 F.3d 269, 283 (4th Cir. 2008); *Pomponio v. Fauquier Cty. Bd. of Supervisors*, 21 F.3d 1319, 1327 (4th Cir. 1994), *overruled in part on other grounds by Quackenbush.*, 517 U.S. at 728-31; *Palumbo v. Waste Tech. Indus.*, 989 F.2d 156, 159-60 (4th Cir.1993); *Front Royal & Warren Cty. Indus. Park Corp. v. Town of Front Royal*, 945 F.2d 760, 763-64 (4th Cir.1991); *Browning-Ferris, Inc. v. Baltimore Cty.*, 774 F.2d 77 (4th Cir. 1985). According to the Fourth Circuit, cases involving questions of state and local land use and zoning law are "classic example[s] of situations in which 'the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *Pomponio*, 21 F.3d at 1327 (quoting *NOPSI*, 491 U.S. at 361); *accord MLC Auto.*, 532 F.3d at 282. Thus, the Fourth Circuit has instructed that "federal courts should not leave their indelible print on local and state land use and zoning laws by entertaining these cases and, in effect, sitting as a zoning board of appeals." *Pomponio*, 21 F.3d at 1327.

Further, the Fourth Circuit stated in *Pomponio*, 21 F.3d at 1327: "Over frequent objections and challenges and in practically every instance, we have held that, absent unusual circumstances, a district court should abstain under the *Burford* doctrine from exercising its jurisdiction in cases arising solely out of state or local zoning or land use law, despite attempts to disguise the issues as

federal claims." The Court noted that cases involving "unusual circumstances" had, to that point, included claims of religious prejudice, federal statutory preemption, and First Amendment rights. *Id.* at 1328. *Cf. Siena Corp. v. Mayor & City Council of Rockville Md.*, 873 F.3d 456, 465 (4th Cir. 2017) (recognizing that "displeasure with State democratic outcomes does not ordinarily rise to the level of a federal constitutional violation"). The *Pomponio* Court ruled, 21 F.3d at 1328:

> We now make plain our decisions: In cases in which plaintiffs' federal claims stem solely from construction of state or local land use or zoning law, not involving the constitutional validity of the same and absent exceptional circumstances not present here, the district courts should abstain under the *Burford* doctrine to avoid interference with the State's or locality's land use policy.

However, in *Quackenbush v. Allstate Ins. Co*., 517 U.S. 706, 716 (1996), the Supreme Court imposed an important limit on *Burford* abstention. In *Quackenbush*, the federal district court, relying on *Burford*, dismissed the plaintiff's lawsuit for contract and tort damages, concerned that deciding the case might interfere with California's regulation of corporate insolvency. *Id.* at 709-10. The Ninth Circuit reversed on the ground that *Burford* only extended to cases where the relief being sought was equitable in nature. The Supreme Court affirmed. *Id.* at 731. Reviewing its abstention jurisprudence, the Court concluded that "the power to dismiss under the *Burford* doctrine, as with other abstention doctrines . . . derives from the discretion historically enjoyed by courts of equity." *Id.* at 728. Thus, the Court stated: "[F]ederal courts have the power to dismiss or remand cases based on abstention principles only where the relief being sought is equitable or otherwise discretionary." *Id.* at 731. As a result, where the plaintiff seeks legal relief, federal courts are without discretion to dismiss the claims on *Burford* grounds. *Id.* at 730-31; *see I-77 Properties, LLC v. Fairfield Cty.*, 288 F. App'x 108, 110 (4th Cir. 2008) (per curiam) ("Where the plaintiff seeks damages, federal courts may not dismiss an action . . . .").

*Quackenbush*, however, does not cast the federal courts into the rough seas of state law whenever the plaintiff pursues damages. Rather, the *Quackenbush* Court explained that the federal court may "postpone adjudication of a damages action pending the resolution by the state courts of a disputed question of state law." 517 U.S. at 730-31; *see also MLC Auto.*, 532 F.3d at 276 n.3 (noting that the "district court correctly stayed [plaintiff's legal claim] rather than dismissing it"); *I-77 Props., LLC*, 288 F. App'x at 110 ("[I]t is still clear [after *Quackenbush*] that federal courts may dismiss claims for equitable relief on *Burford* abstention grounds while staying action on claims for damages.") (citing *Johnson*, 199 F.3d at 727-28).

Faithful adherence to *Quackenbush* "will sometimes require that the damages portion of an action remain in federal court while claims for equitable relief are dismissed entirely." *Johnson*, 199 F.3d at 728 (dismissing claims for injunctive relief and staying plaintiffs' claims for damages where plaintiffs' lawsuit raised "a number of disputed questions of state law yet to be resolved by the state courts"); *cf. Clowdis v. Silverman,* 666 F. App'x 267, 270 (4th Cir. 2016) (vacating the district court's order applying *Younger* abstention to dismiss the plaintiff's damages claims; instructing the court to stay the claims pending the resolution of the issues in state court); *Beam v. Tatum*, 299 F. App'x 243, 248 (4th Cir. 2008) (per curiam) (same); *I-77 Props., LLC*, 288 F. App'x at 110 (affirming district court's stay, on *Burford* grounds, of plaintiff's state law claims stemming from a zoning dispute); *Snyder/Donaldson, LLC v. Anne Arundel Cty.*, No. RDB-17-02950, 2017 WL 67929171, at*5 (D. Md. Dec. 28, 2017) (staying legal claims raised in a land use lawsuit and remanding the plaintiff's equitable claims to state court); 5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 4245 (3d ed. 2019) ("[A] court may stay, rather than dismiss, if Burford abstention should be appropriate in an action for damages.").

*Virdis Development Corp. v. Board of Supervisors of Chesterfield County*, 92 F. Supp. 3d 418 (E.D. Va. 2015), is informative. In that case, the plaintiff sought injunctive relief and damages against the county board of supervisors for violations of the Takings Clause and the Virginia Constitution stemming from the denial of the plaintiff's application for a zoning amendment. *Id.* at 419-20. The defendants moved to dismiss the case on *Burford* grounds. The district court agreed, finding "there are difficult questions of state and local land use law present in this case and federal intervention could be disruptive of the [the state's] efforts to establish a coherent policy with respect to a matter of public concern." *Id.* at 424.

Notwithstanding the absence of pending state proceedings, the court applied *Quackenbush*'s bifurcated approach to the plaintiff's claims. *Id.* at 425. That is, the court dismissed "the entirety of the Amended Complaint to the extent that it seeks declaratory and/or injunctive relief," but stayed "those claims where relief sought by Plaintiff is in the nature of monetary damages." *Id.* at 425.

## 2. Analysis

The DNR Defendants ask the Court to apply either *Pullman* or *Burford* abstention to dismiss plaintiffs' First Amended Complaint. ECF 40-1 at 10-13.[6] They contend that *Burford* abstention is proper because plaintiffs' lawsuit "is wholly predicated upon a judicial determination that the Plaintiffs possess, or are entitled to, a property interest under Maryland common law" in

---

[6] *Pullman* abstention instructs federal courts to abstain where the dispute involves an ambiguous state statute, the interpretation of which may avoid the need to decide a federal constitutional issue. *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501-02 (1941); *see also Expressions Hair Design v. Schneiderman*, ___ U.S. ___, ___, 137 S. Ct. 1144, 1156 (2017) (Breyer, J., concurring in the judgment); *Meredith v. Talbot Cty*, 828 F.2d 228, 231-33 (4th Cir. 1987); *Educ. Servs., Inc. v. Md. State Bd. for Higher Educ.*, 710 F.2d 170, 175 (4th Cir. 1983). The parties have not identified any thorny statutory interpretation issues. Therefore, *Pullman* abstention is inapplicable.

Parcel A. *Id.* at 10-11. This inquiry, they warn, will require this Court to grapple with "[u]nsettled questions" of State and local land use law. *Id.* at 10.

Plaintiffs counter that *Burford* abstention is inapposite, as "this is not a 'zoning' or 'land use' case." ECF 45 at 3. Further, plaintiffs assert that *Burford* is inapplicable because "it is unnecessary to interpret the regulatory scheme discussed by Defendants in order to adjudicate Plaintiffs' claims." *Id.* at 4. And, they argue that *MLC Automotive, LLC, v. Town of Southern Pines*, 532 F.3d 269 (4th Cir. 2008), precludes the application of *Burford* to this case. *Id.* at 3-4.

Count Two asserts that the refusal of the DNR Defendants to recognize plaintiffs' easement to Parcel A is a violation of plaintiffs' right to substantive and procedural due process, and constitutes an unlawful taking. *See* ECF 37 at 26-27. And, in Count Eight, plaintiffs allege that the City's decision to rescind the 2015 building permit "constituted both a temporary and permanent taking of property," in violation of the Fifth and Fourteenth Amendments. *Id.* ¶ 141. These claims, however, are "really [issues of] 'state law in federal law clothing.'" *MCL Auto.*, 532 F.3d at 282 (quoting *Johnson*, 199 F.3d at 721). In order to state viable claims under the Due Process and Takings Clauses, plaintiffs must demonstrate that they had rights in the property that the government appropriated, and property rights are determined according to state law.

Article 24 of the Maryland Declaration of Rights, like the due process clause of the Fourteenth Amendment, protects an individual's interests in substantive and procedural due process. *See Office of People's Counsel v. Md. Pub. Serv. Comm'n*, 355 Md. 1, 25-27, 733 A.2d 996 (1999) (discussing substantive due process); *Roberts v. Total Health Care, Inc.*, 349 Md. 499, 508-09, 709 A.2d 142 (1988) (discussing procedural due process); *see also Pitsenberger v. Pitsenberger*, 287 Md. 20, 27, 410 A.2d 1052 (1980); *City of Annapolis v. Rowe*, 123 Md. App. 267, 275-77, 717 A.2d 976 (1998). In general, there are four "categories" of due process actions:

"(1) a procedural due process claim premised on the deprivation of a property interest; (2) a procedural due process claim premised on the deprivation of a liberty interest; (3) a substantive due process claim premised on the deprivation of a property interest; and (4) a substantive due process claim premised on the deprivation of a liberty interest." *Samuels v. Tschechtelin*, 135 Md. App. 483, 523, 763 A.2d 209 (2000).

Property is an "'interest or estate which the law regards of sufficient value for judicial recognition.'" *Dodds v. Shamer*, 339 Md. 540, 548, 663 A.2d 1318 (1995) (citation omitted); *see also Morrissey v. 4 Aces Bail Bonds*, No. 66, Sept. Term 2016, 2016 WL 853841 at*11-12 (Md. Ct. Spec. App. 2016) (discussing property interests). Generally, the common law concept of property refers to the right and interest a person has in an object, which extends beyond ownership and possession to include the lawful, unrestricted right of use, enjoyment, and disposal of the object. 63C Am. Jur. 2d *Property Defined* § 1 (2019). It includes tangible as well as intangible property. *See, e.g.*, *St. George Antiochaian Orthodox Christian Church v. Aggarwal*, 326 Md. 90, 603 A.2d 484 (1992) (foreclosure of right of redemption of real property).

Property rights "are 'determined by reference to existing rules or understandings that stem from an independent source such as state law.'" *Quinn v. Bd. of Cty. Comm'rs for Queen Anne's Cty.*, 862 F.3d 433, 439 (4th Cir. 2017) (quoting *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998)); *see Tri-Cty. Paving, Inc. v. Ashe Cty.*, 281 F.3d 430, 436 (4th Cir. 2002) ("It is well-settled that the Fourteenth Amendment itself does not create property interests."); *Washlefske v. Winston*, 234 F.3d 179, 183 (4th Cir. 2000) ("The Takings Clause *protects* private property; it does not create it." (emphasis in original)). "The property owner must show more than a mere hope or expectation; '[h]e must, instead, have a legitimate claim of entitlement.'" *Quinn*, 862 F.3d at 439 (quoting *Roth*, 408 U.S. at 577 (1972).

A protected property interest can take a number of forms and is not "uniform." *Dodds*, 339 Md. at 549, 663 A.2d 1318.  For example, an employee ordinarily has a protected property interest in the economic benefits of his employment.  *Rowe*, 123 Md. App. at 292, 717 A.2d 976; *see also Goss v. Lopez*, 419 U.S. 565, 574 (1974) (students suspended for 10 days without a hearing); *Wolff v. McDonnell*, 418 U.S. 539, 555-56 (1974) (prisoners' loss of good time credit); *Morrissey v. Brewer*, 408 U.S. 471 (1972) (revocation of parole).  Moreover, due process rights "do not hinge on receipt of monetary benefits."  *Rowe*, 123 Md. App. at 287, 717 A.2d 976.

In *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972), the Supreme Court discussed the concept of a protected property interest with regard to a "benefit," stating:

> To have property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it.  It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined.  It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.
>
> Property interest, of course, are not created by the Constitution.  Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

To establish a violation of substantive due process, plaintiffs must "'demonstrate (1) that they had property or a property interest; (2) that the state deprived them of this property or property interest; and (3) that the state's action falls so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency.'"  *MCL Auto*, 532 F.3d at 282 (emphasis omitted) (quoting *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 827 (4th Cir. 1995)).  Likewise, because the Takings Clause protects only "private property," U.S. Const. amend. V, analyzing plaintiffs' takings claim "'necessarily begins with determining whether the

government's action actually interfered with the landowner's antecedent bundle of rights.'" *Quinn*, 862 F.3d at 439 (quoting *Sunrise Corp. of Myrtle Beach v. City of Myrtle Beach*, 420 F.3d 322, 330 (4th Cir. 2005)).

The parties vehemently disagree whether the 2005 or 2015 building permits gave rise to a protectable property interest that plaintiffs can assert to advance their constitutional claims.

Regarding the 2005 building permit, the parties contest whether it established an easement over Parcel A, which plaintiffs could then use to satisfy the setback zoning requirement. "An easement is a 'non-possessory interest in the real property of another[.]'" *Emerald Hills Homeowners' Ass'n, Inc. v. Peters*, 446 Md. 155, 162, 130 A.3d 469, 473 (2016) (quoting *Clickner v. Magothy River Ass'n*, 424 Md. 253, 268, 35 A.3d 464, 474 (2012)). "An easement may be created by express grant, by reservation in a conveyance of land, or by implication." *Kobrine, LLC v. Metzger*, 380 Md. 620, 636, 846 A.2d 403, 412 (2004). Implied easements can be created by prescription, the filing of plats, necessity, estoppel, and implied grant or reservation. *Id.* In contrast, an express easement generally "'may be created only in the mode and manner prescribed by the recording statutes.'" *Emerald Hills*, 446 Md. at 162, 130 A.3d at 473 (quoting *Kobrine*, 380 Md. at 636, 846 A.2d at 412). That said, a memorandum which complies with Maryland's Statute of Frauds can also create an express easement. *See id.*; *Kobrine*, 380 Md. at 636, 846 A.2d at 412; *Dubrowin v. Schremp*, 248 Md. 166, 171 235 A.2d 722, 726 (1967). For example, the Maryland Court of Appeals has held that a plat established an express easement because it was signed and sufficiently described the right-of-way. *Emerald Hills*, 46 Md. at 170, 130 A.3d at 478.

Both the City Defendants and the DNR Defendants argue that plaintiffs do not have an implied easement to Parcel A, addressing each potential basis for such an easement in detail. *See* ECF 38-1 at 6-10; ECF 40-1 at 25-28. Plaintiffs do not respond to these arguments, but instead

posit that the 2005 easement "constitutes an *express* easement" to Parcel A.  ECF 45 at 5 (emphasis

in original).  For support, they rely on *Riverwood Commercial Park, LLC v. Standard Oil, Inc.*,

797 N.W.2d 770, 2011 ND 95 (2011), a case in which the Supreme Court of North Dakota held

that a building permit conferred an easement on its owner.  *See* ECF 45 at 5.  However, the DNR

Defendants aver that the 2005 building permit cannot possibly serve as an express easement, as

Maryland law limits such easements to those "created only in the model and manner prescribed by

the recording statutes."  EFC 50 at 11 (quoting *Emerald Hills Homeowners' Ass'n*, 446 Md. at

162, 130 A.3d at 473).

Likewise, the parties disagree as to whether the 2015 building permit entitles plaintiffs to

expand their townhouse.  Plaintiffs rely on the doctrine of vested rights; the defendants parry with

the doctrine of zoning estoppel.

"The vested rights doctrine allows property owners to 'obtain a vested right in an existing

zoning use that will be protected against a subsequent change in a zoning ordinance prohibiting

that use.'"  *Rockville Cars, LLC v. City of Rockland*, 891 F.3d 141, 146 (4th Cir. 2018) (quoting

*Md. Reclamation Assocs., Inc. v. Harford Cty.*, 414 Md. 1, 44-45, 994 A.2d 842, 868 (2010)).  To

establish a vested right, the property owner must: (1) obtain a lawful building permit; (2) begin

building in good faith; and (3) complete a substantial portion of construction.  *See Md. Reclamation

Assocs.*, 414 Md. at 44-45, 994 A.2d at 868; *see also Powell v. Calvert Cty.*, 368 Md. 400, 407-16,

795 A.2d 96, 100-05 (2002); *Prince George's Cty. v. Sunrise Dev. Ltd. P'shp*, 330 Md. 297, 303,

623 A.2d 1296, 1304 (1993).  Because the first element requires that the permit be "lawful," an

invalid building permit does not confer property rights.  *See Marzullo v. Kahl*, 366 Md. 158, 193,

783 A.2d 169, 190 (2001) (finding plaintiff failed to establish a property right under the vested

rights doctrine because the permit was "improperly issued"); *Baiza v. City of Coll. Park*, 192 Md.

App. 321, 334, 994 A.2d 495, 502 (2010) ("One basic requirement for a vested right is that a lawful permit was obtained."); *Relay Imp. Ass'n v. Sycamore Realty Co.*, 105 Md. App. 701, 725 (1995) ("In Maryland, our strict version of the vested rights rule . . . provides, in effect, that a landowner may rely on nothing other than a properly-issued permit."); *see also Rockville Cars,* 891 F.3d at 147 ("[Maryland] law does not entitle permit holders to a property right when permits are obtained on the basis of mistake or in violation of the law. Such events render any permit void *ab initio*.").

However, the strictures of the vested rights doctrine are tempered by the doctrine of zoning estoppel, which precludes the government from litigating whether the permit was issued in error. *Permanent Fin. v. Montgomery Cty.*, 308 Md. 239, 249-52, 518 A.2d 123, 128-30 (1986); *see also Md. Reclamation Assocs.*, 414 Md. at 57, 994 A.2d at 875 (discussing but declining to apply the doctrine of zoning estoppel). To apply, the party asserting the doctrine must have relied on the permit in good faith and the ordinance on which the permit is based must be ambiguous. *See Permanent Fin.*, 308 Md. at 247-52, 518 A.2d at 127-29; see also *Md. Reclamation Assocs.*, 414 Md. at 57, 994 A.2d at 875; *see also Biser v. Town of Bel Air*, 991 F.2d 100, 104 (4th Cir.1993) ("Under Maryland law, equitable estoppel of a municipal corporation requires (1) an official act taken within the scope of authority; (2) an ambiguous statute or ordinance; and (3) detrimental reliance by a third party.").

The City Defendants argue that plaintiffs do not have a vested right in the 2015 building permit because it was issued "based on errors in the calculation of the setbacks and parking requirements," and plaintiffs performed only a "minimal" amount of work before the permit was revoked. ECF 38-1 at 15. Plaintiffs acknowledge that, under Maryland law, an erroneously-granted permit ordinarily does not imbue its holder with a property interest. ECF 44-1 at 3. But, they assert that the doctrine of zoning estoppel precludes the City from contesting the permit's

invalidity. *Id.* The City Defendants counter that this narrow exception is unavailing because the setback requirement is clear-cut and, therefore, "the error was not an incorrect interpretation of an ambiguous zoning ordinance[.]" ECF 52-1 at 5.

Plaintiffs insist that *Burford* abstention is foreclosed by the Fourth Circuit's decision in *MLC Auto.*, 532 F.3d 269. This is not so.

In *MLC Auto*, an auto dealer purchased land for an auto dealership. *Id.* at 273. The defendant local government approved the plaintiff's designs, a precondition to obtaining a building permit. *Id.* at 274. However, after the community mobilized against the dealership, the local government rezoned the property. *Id.* The plaintiff sued in federal court, alleging, *inter alia*, that the rezoning violated its vested rights in the property as well as federal and state substantive due process. *Id.* at 276. Applying *Burford* and *Quackenbush*, the district court, *sua sponte*, "stayed the case pending the resolution of the land use and zoning issues in state courts." *Id.* (internal quotation marks and citation omitted). The local government appealed, arguing, in part, that the district court abused its discretion in abstaining because the plaintiff's claims did not involve difficult questions of state law. *Id.* at 281.

The Fourth Circuit disagreed. Canvassing North Carolina decisions, the Court concluded that the plaintiff "sits in somewhat of a gray area on the edges of the vested rights doctrine under North Carolina law." *Id.* at 284. The Court stated: "A ruling in this case on [the plaintiff's] vested rights claim by necessity would impact the land use policy of the [local government]." *Id.* Thus, the Court affirmed the district court's decision to abstain and stay the case under *Burford*. *Id.*

The Littles insist that this case does not present difficult questions of State law so as to justify abstention. ECF 45 at 3-4. Plaintiffs' attack on *Burford* abstention falls flat.

For purposes of *Burford*, this case would seem unexceptional. Plaintiffs do not allege claims of religious discrimination, federal statutory preemption, or First Amendment violations—the kinds of cases where *Burford* abstention is not appropriate. *See, e.g.*, *Nuefeld v. City of Baltimore*, 964 F.2d 347, 350 (4th Cir. 1992) (admonishing that *Burford* is "particularly inappropriate when preemption issues are present"); *Jesus Christ is Answer Ministries, Inc. v. Balt. Cty.*, 303 F. Supp. 3d 378, 388-89 (D. Md. 2018) (declining to apply *Burford* abstention to RLUIPA claims), *rev'd on other grounds* 915 F.3d 256 (4th Cir. 2019); *Hunt Valley Baptist Church, Inc. v. Baltimore Cty.*, No. ELH-17-804, 2017 WL 4801542, at*20 (D. Md. Oct. 24, 2017) (same); *Reaching Hearts Int'l v. Prince George's Cty.*, 584 F. Supp. 2d 776, 792-93 (D. Md. 2008) (same), *aff'd*, 368 F. App'x 370 (4th Cir. 2010). But, the State law implicated in this case is far from straightforward. *See Town of Nags Head v. Toloczko*, 728 F.3d 391, 397-98 (4th Cir. 2013) (reversing district court's application of *Burford* because the state law was "clear").

Indeed, the parties do not cite to a reported Maryland appellate case that has addressed whether a building permit can create an express easement under circumstances akin to those in this case. Nor is it clear that a Maryland court would embrace plaintiffs' theory, given that, generally, an express easement "may be created only in the mode and manner prescribed by the applicable recording statutes." *USA Cartage Leasing, LLC v. Baer*, 429 Md. 199, 209, 55 A.3d 510, 516 (2012); *but see Emerald Hills Homeowners' Ass'n*, 446 Md. at 162-63, 130 A.3d at 473-74 (suggesting that that this is a "simply a 'general rule'" subject to exceptions) (citation omitted).

Plaintiffs' contention that they have a vested property right in the 2015 building permit based on the doctrine of zoning estoppel is equally murky. *See Md. Reclamation Assocs., Inc.*, 414 Md. at 58, 994 A.2d at 876 (recognizing zoning estoppel, but admonishing that it "must be applied, if at all, sparingly and with the utmost caution"); *accord St. Andrew's Episcopal School,*

2

*Inc. v. Fitzsimmons*, No. 1994, Sept. Term, 2016, 2017 WL 6337197, at*6 (Md. Ct. Spec. App. 2017) ("We further note that zoning estoppel has been discussed by Maryland appellate courts on a theoretical level but has never been actually adopted as the law in the State of Maryland, nor applied to the facts of a particular case.").

As I see it, *MLC Auto.* applies here on all fours. Based on the welter of arguments concerning easements, vested rights, and zoning estoppel, plaintiffs' federal claims are inextricably intertwined with Maryland land use law—the "classic example . . . where *Burford* should apply." *MLC Auto.*, 532 F.3d at 282 (quoting *Pomponio*, 21 F.3d at 1327).

Maryland law controls plaintiffs' federal takings and due process claims. Indeed, plaintiffs cannot even get out of the starting gate unless State law grants them a property interest in either the 2015 building permit or Parcel A. And, as in *MLC Auto.*, plaintiffs' property rights fall "in somewhat of a gray area" of Maryland land use law. Plaintiffs argue that *MLC Auto.* cuts in their favor, pointing to the Fourth Circuit's statement there that "[t]he case *might* be different if . . . [the plaintiff] had already received its building permit." ECF 45-1 at TK (quoting *MLC Auto.*, 532 F.3d at 284). But besides being dicta, that rumination pertains to the vested rights doctrine according to North Carolina law. *MLC Auto.*, 532 F.3d at 283-84. Therefore, it has no bearing here, where plaintiffs' property rights must be determined according to Maryland law.

Barring "exceptional circumstances," of which none have been identified, "abstention is proper "to avoid interference with the state's or locality's land use policy." *Pomponio*, 21 F.3d at 1328. The parties' conflicting contentions regarding Parcel A and the 2015 building permit should be decided by a Maryland State court in the first instance. I will not attempt to divine how the Maryland courts would resolve this case. *See, e.g.*, *La. Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 29 (1959) (federal court interpretation of state zoning law is merely a "dubious and

tentative forecast"); *Johnson*, 199 F.3d at 720 (reprimanding the district court for "trying to predict

how the South Carolina Supreme Court would decide [a land use] question," instead of applying

*Burford* abstention).

Accordingly, I shall apply the *Burford* doctrine and abstain, at this juncture, from deciding

the federal claims remaining in Count Two and raised in Count Eight. Because plaintiffs seek

damages against the City in Count Eight, I shall stay Count Eight, pending resolution of the land

use and zoning issues by the State courts. And, as to the claim against the DNR Defendants

individually, I shall exercise my discretion and stay the portion of Count Two with regard to the

Littles' demand for prospective equitable relief.

### F. Supplemental Jurisdiction – Counts Three through Six

Because I shall stay plaintiffs' federal claims pending the adjudication of the underlying

land use issues in State court, I must now decide whether to exercise supplemental jurisdiction

over plaintiffs' remaining State law claims raised in Counts Three through Six. Supplemental

jurisdiction is governed by 28 U.S.C. § 1367.

"[T]he doctrine of supplemental jurisdiction . . . 'is a doctrine of flexibility, designed to

allow courts to deal with cases involving pendent claims in a manner that most sensibly

accommodates a range of concerns and values.'" *Jordahl v. Democratic Party of Va.*, 122 F.3d

192, 203 (4th Cir. 1997) (quoting *Shanaghan v. Cahill*, 58 F.3d 106, 106 (4th Cir. 1995)). In *ESAB

Group, Inc. v. Zurich Insurance PLC*, 685 F.3d 376, 394 (4th Cir. 2012), the Fourth Circuit

described the traditional approach to supplemental jurisdiction (previously known as "pendent"

jurisdiction). It said, *id.* at 394 (internal citation omitted):

> [S]o long as one claim in an action presented a federal question on the face of the
> well-pleaded complaint, a court could exercise jurisdiction over the entire
> constitutional case or controversy. It does not follow, however, that the federal
> court had original jurisdiction over the entire case; rather, it had original jurisdiction

2

over at least one claim, allowing the exercise of supplemental/pendent jurisdiction over the remaining claims. And the Supreme Court subsequently recognized that, when the exercise of pendent jurisdiction over these claims became "inappropriate," district courts had inherent authority to remand them to state courts.

Pursuant to § 1367(c)(3), a district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." In *Shanaghan v. Cahill*, 58 F.3d at 110, the Fourth Circuit recognized that under § 1367(c)(3), "trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when federal claims have been extinguished." *See also ESAB*, 685 F.3d at 394 ("Section 1367(c) recognizes courts' authority to decline to exercise supplemental jurisdiction in limited circumstances, including . . . where the court dismisses the claims over which it has original jurisdiction."); *Hinson v. Norwest Fin. S. Carolina, Inc.*, 239 F.3d 611, 616 (4th Cir. 2001) (stating that, "under the authority of 28 U.S.C. § 1367(c), authorizing a federal court to decline to exercise supplemental jurisdiction, a district court has inherent power to dismiss the case . . . provided the conditions set forth in § 1367(c) for declining to exercise supplemental jurisdiction have been met"). *See also*, *e.g.*, *Ramsay v. Sawyer Prop. Mgmt. of Md., LLC*, 948 F. Supp. 2d 525, 537 (D. Md. 2013); *Int'l Ass'n of Machinists & Aerospace Workers v. Werner-Masuda*, 390 F. Supp. 2d 479, 500 (D. Md. 2005) ("Because the court will dismiss the claims over which it has original jurisdiction, the court will decline to exercise supplemental jurisdiction over the remaining state law claims.").

Section 1367(c)(2) of Title 28 of the United States Code is relevant here. It provides that a district court may decline to exercise supplemental jurisdiction if the supplemental claim "substantially predominates over the claim or claims over which the district court has original jurisdiction." 28 U.S.C. § 1367(c). In this case, that is certainly the situation.

Therefore, because I have stayed plaintiffs' federal claims, I will exercise my discretion and decline to exercise supplemental jurisdiction over Counts Three, Four, Five, and Six, which are raised under Maryland law. Plaintiffs' claims arising under Maryland law shall be dismissed, without prejudice.[7]

## G. Specific Performance – Count Seven

In Count Seven, plaintiffs ask the Court to "compel the DNR to immediately return Parcel A" to the City. ECF 37-1, ¶ 36. Plaintiffs do not provide any legal basis for the relief which they seek in Count Seven.

The DNR Defendants argue that Count Seven fails to state a claim because "'a claim for injunctive relief is not a standalone cause of action.'" ECF 40-1 at 31 (quoting *Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 770 (D. Md. 2015)). Further, the DNR Defendants contend that Count Seven seeks retrospective injunctive relief and is therefore barred by the Eleventh Amendment. *Id.* at 32-33. And, the DNR Defendants assert that Count Seven fails as a matter of law because specific performance is a remedy rooted in contract law, and the "[t]he Littles do not allege that a contract exists between them, and Secretary Belton." *Id.* at 35.

Plaintiffs have failed to oppose defendants' argument. As a result, the DNR Defendants insist that plaintiffs have conceded that Count Seven is deficient. ECF 50 at 2-4.

---

[7] Plaintiffs are cautioned that, under 28 U.S.C. § 1367(d), State law claims brought in federal court under supplemental jurisdiction that are dismissed "shall be tolled" while the claim is pending in federal court, and for a period of 30 days after dismissal. In *Turner v. Kight*, 406 Md. 167, 189, 957 A.2d 984, 997-98 (2008), the Maryland Court of Appeals observed that § 1367(d) "serves to suspend the running of a State statute of limitations from the time the State-law claim is filed in U.S. District Court until 30 days after (1) a final judgment is entered by the U.S. District Court dismissing the pendant State-law claims, or (2) if an appeal is noted from that judgment, issuance of an order of the U.S. Court of Appeals dismissing the appeal or a mandate affirming the dismissal of those claims by the District Court."

To be sure, a district court "has an obligation to review the motions to ensure that dismissal is proper" notwithstanding a plaintiff's failure to respond. *Stevenson v. City of Seat Pleasant*, 743 F.3d 411, 416 n.3 (4th Cir. 2014). Nevertheless, when the plaintiff fails to oppose a motion to dismiss, a district court is "entitled, as authorized, to rule on the . . . motion and dismiss [the] suit on the uncontroverted bases asserted" in the motion. *Pueschel v. United States*, 369 F.3d 345, 354 (4th Cir. 2004); *see Parker v. Am. Brokers Conduit*, 179 F. Supp. 3d 509, 515 (D. Md. 2016); *Pruitt v. Wells Fargo Bank, N.A.,* Civ. No. DKC-15-1308, 2015 WL 9490234 at *3 (D. Md. Dec. 30, 2015); *Ferdinand–Davenport v. Children's Guild*, 742 F.Supp.2d 772, 777 (D. Md. 2010); *cf. Cox v. SNAP, Inc.*, 859 F.3d 304, 308 n.2 (4th Cir. 2017) ("'If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal.'"(citation omitted)).

Given plaintiffs' failure to respond to the DNR Defendants contentions regarding Count Seven, I can only assume that plaintiff concedes that the claim is deficient for the reasons stated by the DNR Defendants. Therefore, I will exercise my discretion to dismiss Count Seven.

## V. Conclusion

For the foregoing reasons, the Motion to Strike (ECF 39) is DENIED. The City Defendants' motions to dismiss (ECF 38) is GRANTED in part and DENIED in part. I shall dismiss Count One, to the extent it raises a *Monell* claim under § 1983. And, I shall dismiss Counts Three through Seven of the First Amended Complaint (ECF 37), without prejudice. However, I shall stay Count Eight of the First Amended Complaint (ECF 37) to the extent that it seeks damages, pending the resolution of plaintiffs' property right claims in State court.

The DNR Motion (ECF 40) is GRANTED in part and DENIED in part. Count Two is dismissed, without prejudice, to the extent that it seeks monetary damages against the DNR

Defendants in their individual or official capacities.  However, to the extent that Count Two seeks prospective equitable relief, I shall stay Count Two.  I shall dismiss Count Seven, without prejudice.

An Order follows, consistent with this Memorandum Opinion.


Date:   September 26, 2019                            _____/s/_____
                                                     Ellen Lipton Hollander
                                                     United States District Judge